## G. Mason Cadwell, Jr., Petitioner *v*. Commissioner of Internal Revenue, Respondent

Docket No. 15456–08.          Filed January 3, 2011.

K, an S corporation 100 percent owned by P's spouse, adopted and, through its subsidiary KSM, made contributions to a multiemployer welfare-benefit plan (the plan). Through KSM, K made a contribution to the plan, part of which was used to purchase life insurance coverage for P and K's other employees, and the remainder of which was an excess contribution. The plan was amended and converted to a single-employer plan. The plan's qualification pursuant to sec. 419A(f)(6), I.R.C., is not in issue. *Held*: R was not required to send P a "30 day letter", and the notice of deficiency adequately sets forth R's position in this case and is therefore valid. *Held*, *further*, P's interest in the plan became substantially vested upon the plan's conversion from a multiemployer plan to a single-employer plan. Sec. 1.402(b)–1(b)(1), Income Tax Regs. *Held*, *further*, P must include in gross income the cash value of the life insurance policy on P's life. The value of the life insurance policy is the PERC (premiums, earnings, and reasonable charges) pursuant to Rev. Proc. 2005–25, 2005–1 C.B. 962. P has not contended that we should deviate from the safe harbor provision of Rev. Proc. 2005–25, *supra*; thus, P may not reduce the PERC value by the surrender charge under that provision. *Held*, *further*, P must include in his gross income the excess contributions pursuant to sec. 1.402(b)–1(b)(1), Income Tax Regs. *Held*, *further*, the current year cost of insurance protection is an accession to wealth which P must include in gross income pursuant to sec. 61(a), I.R.C. *Held*, *further*, where the fair market value of a life

insurance policy has been determined using the PERC method, P must include in his gross income as the cost of life insurance protection an amount equal to the sum of mortality charges and other expenses. *Held*, *further*, P is liable for the accuracy-related penalty for a substantial understatement of income tax pursuant to sec. 6662(a) and (b)(2), I.R.C.

*Richard H. Morton* and *Kevin J. Ryan*, for petitioner.
*Kathleen Tagni*, *Sherri Wilder*, and Betty Clary (specially recognized), for respondent.

OPINION

WELLS, *Judge*: This case is before the Court on petitioner's motion for summary judgment and respondent's cross-motion for summary judgment pursuant to Rule 121.[1] Respondent determined a deficiency of $33,057 in petitioner's Federal income tax for tax year 2004 and a penalty pursuant to section 6662(a) of $6,611. On August 31, 2009, petitioner filed a motion for summary judgment. On October 5, 2009, respondent filed a response to petitioner's motion for summary judgment and a cross-motion for summary judgment. On October 26, 2009, petitioner filed a motion to amend his petition.[2] On November 4, 2009, petitioner filed a response to respondent's cross-motion for summary judgment. On November 16, 2009, a hearing was held on the parties' motions. On November 19, 2009, respondent filed a reply to petitioner's response to respondent's motion for summary judgment and an objection to petitioner's motion to amend his petition.

The issues to be decided as a consequence of petitioner's motion for summary judgment and respondent's cross-motion for summary judgment are: (1) Whether respondent was required to send a "30 day letter" to petitioner and whether the notice of deficiency adequately sets forth respondent's position in the instant case; (2) whether petitioner must include in gross income the cash value of a life insurance policy held by a multiemployer welfare benefit plan that was converted to a single-employer welfare benefit plan during the year in issue; (3) whether petitioner

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] By separate order, we will deny petitioner's motion to amend his petition.

must include in his gross income payments made by his employer in excess of the cost of current year life insurance protection (excess contribution); (4) whether petitioner must include in his gross income the current year cost of life insurance protection paid by his employer; and (5) whether petitioner is liable for the penalty under section 6662. [3]

## Background

The background facts are drawn from the pleadings, the parties' motions, facts deemed established, and stipulated exhibits and are not in dispute. [4]

At the time of filing of the petition, petitioner was a resident of North Carolina.

Petitioner is married to Jennifer K. Cadwell (Mrs. Cadwell). Petitioner and Mrs. Cadwell have two daughters, Jennifer Keady Cadwell (Jennifer) and Miranda M. Cadwell (Miranda). For his 2002 through 2004 tax years, petitioner filed Forms 1040, U.S. Individual Income Tax Return, claiming a filing status of married filing separately. For his 2002 through 2004 tax years, petitioner did not report any wages or salaries on line 7 of Form 1040.

Keady Ltd. (Keady) is a Pennsylvania S corporation organized during 1998 pursuant to sections 1361–1375. Keady is, and has always been, 100 percent owned by Mrs. Cadwell. Mrs. Cadwell is the sole director of Keady. During 2002 through 2004, petitioner served as the secretary of Keady. Keady does not have any minutes of shareholders or directors meetings for 2002 through 2004. During 2002 through 2004, Keady's only income was its share of income (or loss) from KSM, Limited Partnership (KSM), a Pennsylvania limited partnership formed during 1998.

During 2002 through 2004, KSM was owned as follows: 90 percent by Mrs. Cadwell; 5 percent by Keady; 2 percent by petitioner; 1.5 percent by Jennifer; and 1.5 percent by Miranda. Keady is the general partner of KSM.

During December 2002, petitioner and Mrs. Cadwell decided to obtain employee welfare benefits for petitioner, Jennifer, and Miranda through the National Benefit Plan

---

[3] In the notice of deficiency, respondent determined adjustments to petitioner's personal exemption and itemized deductions. These adjustments are computational and will depend on the Court's resolution of the issues discussed herein.

[4] Certain facts were deemed established by separate order of the Court.

and Trust.[5] The respective plan documents are hereinafter referred to as the Plan, and the respective trust created under the Plan is hereinafter referred to as the Trust. According to its original terms, the Plan was organized as a multiemployer welfare benefit plan pursuant to section 419A(f)(6).[6] The documents describe the Plan's design and operation. The primary purpose of the Plan is to provide severance and death benefits to eligible employees. According to the Plan, each employer is to bear the full cost of the benefits provided. Assets held by the Trust are protected from the claims of each employer's creditors. Each employer enrolled in the Plan is entitled to elect the amount of benefits to provide and the period over which such benefits become vested. Upon termination of the Plan or employer withdrawal from the Plan, an employee's nonforfeitable benefits are deemed to be 100 percent vested, regardless of the vesting schedule set by the employer.[7]

Before joining the Plan, a prospective employer provides to the Plan sponsor, Niche Plan Sponsors (Niche), employment information regarding the employees whom the employer chooses to include in the Plan. Niche uses the employer's information to create a package of information that contains a summary of the Plan's benefits to the employer and its employees. According to the summary, petitioner receives $50,000 a year in wages from Keady.

On December 31, 2002, petitioner signed the document adopting the Plan as secretary on behalf of Keady. Petitioner was 64 years old at the time Keady adopted the Plan. The adoption agreement identifies Niche as the Plan sponsor, National Plan Advisory as the Plan Administrator, Wells Fargo Bank as the Plan Trustee, and National Benefit Plan and Trust as the Record Owner of the Trust's assets. Keady elected to cover petitioner, Miranda, and Jennifer with death benefits equal to 20 times the covered employee's compensation, severance benefits equal to 14.847 percent of compensation per year up to 10 years (not to exceed 200 percent), and a modified 4–40 vesting schedule (vesting schedule). Under the vesting schedule, an employee is first vested in severance

---

[5] The parties agree that the trust was not exempt from tax under sec. 501(a).

[6] Whether the Plan meets the requirements of sec. 419A(f)(6) is not in issue.

[7] The Plan states: "The Plan shall terminate upon delivery by the Plan Sponsor to the Trustee of a written and signed notice of termination."

benefits at 40 percent of the stated benefit after 4 years of employment, with vesting increasing to 100 percent at year 10 of employment.

Life insurance covering petitioner's and his daughters' lives was selected to fund the death and severance benefits payable under the Plan to petitioner and his daughters.[8] For petitioner, a universal life policy with an initial death benefit of $1 million that also accumulates cash value (hereinafter referred to as the life insurance policy) was selected to fund his benefit.[9] The life insurance policy was issued by Lincoln National Life Insurance Co. (Lincoln Life) on December 7, 2002. Petitioner named Miranda and Jennifer as beneficiaries of the life insurance policy. In his life insurance policy application, petitioner listed himself as "Manager" of Keady.

For Miranda and Jennifer, identical 10-year, level term life insurance policies on their lives with death benefits of $300,000 were selected to fund their benefits. The annual combined premiums on those policies totaled $645. On their life insurance applications, Miranda and Jennifer were identified as "Consultants" for Keady.

On December 31, 2002, KSM paid $75,000 by check to Compass Bank,[10] the Plan Trustee, to cover Keady's obligation under the Plan, and $2,050 for the Plan fee. Both checks were drawn on KSM's Centennial Bank account and were signed by petitioner. Lincoln Life credited petitioner's life insurance policy for a payment of $73,000 for the month ending January 6, 2003. Petitioner did not include any income on his 2002 Form 1040 as a result of any life insur-

---

[8] The parties do not specify how the severance benefits are to be funded, whether through the cash value of the life insurance policy or some other option. The adoption agreement states: "The adopting employer shall contribute for each Covered Employee the contribution necessary to fund a Covered Employee's Target Severance Benefit, determined under the formula and rules set forth in this Article."

[9] There are many different kinds of life insurance policies.

Term life insurance covers the insured only for a particular period, and upon expiration of that period, terminates without value. Whole life insurance covers an insured for life, during which the insured pays fixed premiums, accumulates savings from an invested portion of the premiums, and receives a guaranteed benefit upon death, to be paid to a named beneficiary. Universal life insurance is term life insurance in which the premiums are paid from the insured's earnings from a money-market fund. Variable life insurance is life insurance in which the premiums are invested in securities and whose death benefits thus depend on the securities' performance, though there is a minimum guaranteed death benefit. * * * [*Curcio v. Commissioner*, T.C. Memo. 2010–115.]

[10] The record does not reveal at what point Compass Bank assumed the role of Plan Trustee.

ance premiums paid by KSM. The payments to the Plan Trustee were not claimed as a deduction on KSM's or Keady's 2002 Federal income tax return. Petitioner's accountant, Robert W. Nicolini, C.P.A. (Mr. Nicolini), was not aware of the payments or that KSM had a bank account with Centennial Bank.

On May 20, 2004, KSM paid $38,800 to 419 Plan Administrators,[11] the new Plan Administrator, to cover Keady's obligation under the Plan. Of that amount, $36,000 was paid to cover the Plan contribution and $2,800 was paid as the Plan fee. The checks were drawn on the "KSM Limited Partnership Escrow Account, c/o Crawford Wilson and Ryan LLC" (KSM escrow account).[12] The KSM escrow account was maintained at National Penn Bank. When Mr. Nicolini prepared KSM's 2004 Federal income tax return, he discovered the $38,800 in payments made to 419 Plan Administrators. Mr. Nicolini was not aware that KSM or Keady was participating in the Plan. Mr. Nicolini asked Miranda, the tax matters partner of KSM, about the payments. Miranda, who was unable to verify the payments, thought they were for a horse. Mr. Nicolini recorded the amounts as payments for "horses" and "booked" them as an asset on KSM's balance sheet. Mr. Nicolini never depreciated the "horses" on KSM's balance sheet, and, during 2006, the "horses" were distributed to the Cadwells as a capital distribution. Lincoln Life credited petitioner's life insurance policy for an $18,000 payment for the month ended September 6, 2004.[13]

On June 5, 1995, the Internal Revenue Service (IRS) issued Notice 95–34, 1995–1 C.B. 309, which described certain multiemployer plans (MEPs) that do not qualify under section 419A(f)(6). In Notice 2001–51, 2001–2 C.B. 190, the IRS designated those transactions described in Notice 95–34, *supra*, as "listed transactions" subject to enhanced disclosure requirements.[14] On October 22, 2004, the American Jobs

---

[11] The record does not reveal when 419 Plan Administrators became the Plan Administrator.

[12] KSM paid this amount using two checks, one for $38,000, dated May 20, 2004, and the other for $800, dated May 20, 2004.

[13] The record does not reveal why petitioner's life insurance policy was not credited with a $36,000 payment or why petitioner's payment in May was not credited until September. Petitioner's life insurance policy was not credited with a payment for 2005.

[14] Notice 2001–51, 2001–2 C.B. 190, was supplemented and superseded by Notice 2003–76, 2003–2 C.B. 1181, which was supplemented and superseded by Notice 2004–67, 2004–2 C.B. 600, which was supplemented and superseded by Notice 2009–59, 2009–31 I.R.B. 170. Notice

Continued

Creation Act of 2004, Pub. L. 108–357, sec. 811(a), 118 Stat. 1575, became law and instituted a new penalty for failure to disclose a listed transaction. See sec. 6707A.

On November 17, 2004, Niche sent letters to the employers participating in the Plan announcing that the Plan had been split into single-employer welfare benefit plans (SEPs or individually SEP).[15] The reasons stated in the letters for the conversion included more employer control over Plan assets and the concern that the Plan might be subject to listed transaction penalties under section 6707A. Niche's letter acknowledged that the SEPs no longer qualified for treatment pursuant to section 419A(f)(6), and, therefore, the deductibility of the employer's contributions would be limited. Keady's employee welfare benefit plan was renamed the "Keady, Ltd. Welfare Benefit Plan", and the assets were maintained by the National Benefit Trust II.

On December 30, 2004, Niche and Wells Fargo, as Trustee, entered into a new trust agreement for the National Benefit Trust II. By its terms, the agreement is a "complete amendment and restatement" of the original trust agreement. Significantly, the new agreement provides that the Plan Administrator is now the employer unless the employer designates another person or persons to be Plan Administrator. The new agreement provides that the employer, Keady, can terminate the SEP at any time. In the event of Keady's withdrawal[16] from the SEP, at the end of the 23-month period following the date Keady terminated the SEP (the 23-month period), the Trust has the option to distribute the life insurance policies to Keady, sell the life insurance policies to any interested purchaser with an insurable interest in the employees, or surrender the life insurance policies to the insurance company for their cash surrender value. Additionally, the Trust can sell petitioner his life insurance policy.

2009–59, *supra*, includes transactions described in Notice 95–34, 1995–1 C.B. 309, as listed transactions.

  Listed transactions are transactions that are the same as or substantially similar to those transactions that have been determined by the IRS to be tax avoidance transactions and have been identified by notice, regulation, or other form of published guidance. Sec. 1.6011–4(b)(2), Income Tax Regs.

  [15] According to the letters, the change was made effective retroactively to Jan. 1, 2004. However, we treat the change as actually occurring on Nov. 17, 2004, as this is the date of the actual conversion.

  [16] The new agreement setting up the SEP appears to use employer "withdrawal" and employer "termination" interchangeably.

During the 23-month period, Keady would be required to continue paying the annual cost of the life insurance. If petitioner were to die before the end of the 23-month period, he would still be eligible for the death benefits under the SEP.

Keady, KSM, petitioner, Mrs. Cadwell, Miranda, and Jennifer were not consulted by Niche before the split of the Plan into separate SEPs. Keady, KSM, petitioner, Mrs. Cadwell, Miranda, and Jennifer did not attempt to access or use the Plan benefits at any time during 2004 or 2005. Petitioner did not include on his Form 1040 for his 2004 tax year any income resulting from the conversion of the Plan from an MEP to an SEP.

During December 2004, the life insurance policy covering petitioner had a death benefit value equal to $1,070,529, a "fund" value equal to $70,529 and a surrender value equal to $25,237.[17] The fund value was determined by adding the premiums paid ($91,000 = $73,000 + $18,000) and interest credited ($6,134 = $3,340 + $2,793), less mortality charges[18] ($16,235 = $7,738 + $8,497) and other expenses ($10,370 = $7,730 + $2,640).[19] The surrender value was the amount of cash that petitioner would receive upon surrender of the life insurance policy to Lincoln Life and was calculated by subtracting a surrender charge of $45,291 from the fund value of $70,529, yielding a surrender value of $25,237.[20]

Kevin Ryan (Mr. Ryan), petitioner's counsel in this case, prepared two legal opinions for Niche, dated December 6, 2004, and June 16, 2005. Mr. Ryan began serving as counsel

---

[17] The death benefit is the projected amount payable upon the death of the insured. The "fund" value represents the equity in the life insurance policy and is also known as the cash value of the life insurance policy.

[18] Mortality charges are also referred to as "cost of insurance charges." The IRS provided the following explanation of mortality charges in Priv. Ltr. Rul. 2009–06–001 n.5 (Oct. 17, 2008):

COI/mortality charges are determined by multiplying a mortality rate (which increases with the age of the insured) by the "net amount at risk" (the difference between the death benefit and the cash value, *i.e.*, the pure insurance element of the contract). Mortality rates are determined with reference to a particular mortality table * * *.

In other words, the mortality charges approximate the term life insurance component of a whole life or universal life policy. However, because of concerns that insurers might manipulate such rates, the IRS will not view the mortality charges as the actual premium rates for term life insurance unless the insurer generally makes such rates available to those who apply for term insurance coverage and the insurer regularly sells term insurance coverage at such rates. See Notice 2002–8, 2002–1 C.B. 398, 398–399.

[19] The interest credits, mortality charges, and expenses are for 2003 and 2004.

[20] These dollar amounts are rounded down to the nearest whole number.

to Niche after petitioner was involved in the Plan. In Mr. Ryan's opinion letter of December 6, 2004, he stated:

QUESTION: Will participants in the Trust have income on the current value of the death benefits provided under the Trust equal to the lower of the so-called "PS 58 Rates" or the insurance company's term insurance rates? * * *
ANSWER: Yes * * *

In his explanation of the taxation of Plan benefits, Mr. Ryan stated:

The death benefits are nontransferable, therefore subject to a substantial risk of forfeiture and employees have no right to any cash value, employees should not be taxed on the death benefit as a transfer of a permanent life insurance policy. Nevertheless, participating employees receive an economic benefit each year for the death benefit coverage that is provided for that year. Thus, in accordance with Regulation Section 1.83–1(a)(2), employees should be taxed each year on the cost of the life insurance protection under Code Section 61 and the Regulations thereunder in an amount which is equal to the reasonable net premium cost as determined by the Commissioner of the current life insurance protection as defined in Regulation Section 1.72–16(b)(3) provided by such contract. The reasonable net premium costs of the current life insurance protection as defined in Regulation Section 1.72–16(b)(3) is the same measure of value for life insurance protection that qualified retirement plans use. The Service has determined the reasonable net premium costs and published those amounts as "PS 58 rates." In Rev. Rul. 66–110, 1966–1 C.B. 12, the Service held that an employer may use the current published premium rates charged by an insurer for individual one-year term life insurance available to all standard risks for determining the costs of insurance in connection with individual policies instead of the PS 58 costs table. In Notice 2001–10, an alternative table is set forth labeled Table 2001.

It is the Firm's opinion that participating employees in the Trust receive an economic benefit for the death benefit protection provided each year under the Trust. The annual tax for such benefits shall be determined in accordance with Code Section 83 and the Regulations thereunder and shall be the lower of the PS 58 table costs or the insured's term insurance rates in accordance with Rev. Rul. 66–110.

[Fn. ref. omitted.]

On April 2, 2008, respondent sent petitioner a notice of deficiency in which he determined that petitioner's gross income for 2004 should be increased by $102,039. The unreported income determined by respondent consists of: (1) The fund value of the life insurance policy as of December 6, 2004, of $70,529; (2) the excess contribution to the Plan of

$18,000,[21] and (3) the cost of term life insurance on petitioner's life for 2004 of $13,510. Petitioner timely filed a petition in this Court.

## *Discussion*

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." Rule 121(b) directs that a decision on such a motion shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."

The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). Facts are viewed in the light most favorable to the nonmoving party. *Id.* However, where a motion for summary judgment has been properly made and supported, the opposing party may not rest upon mere allegations or denials in that party's pleadings but must by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial. Rule 121(d).

## I. *Caselaw Concerning Section 419A(f)(6) Plans*

The issues we must decide concern the income tax consequences of employee welfare benefits. Generally, contributions to welfare benefit plans are deductible by an employer when paid if they qualify as ordinary and necessary business expenses, but only to the extent allowed by sections 419 and 419A. Secs. 162(a), 419, 419A(f)(6). In recent years, adopted multiemployer plans have been claiming to satisfy section 419A(f)(6) and purporting to generate deductions for the insurance benefits provided under the plans. Notice 95–34, *supra*. This Court has decided several cases regarding purported section 419A(f)(6) plans.

---

[21] In the notice of deficiency, respondent contends that the value of the excess contribution was $18,000. Respondent concedes that of the $38,800 contributed, $2,800 was for the Plan fee and $18,645 was for life insurance premiums ($18,000 for petitioner and $645 for Miranda and Jennifer). Therefore, respondent contends that the excess contribution of $17,355 should be included in petitioner's gross income.

In *Booth v. Commissioner*, 108 T.C. 524, 565 (1997), we held that the plan in issue did not meet the requirements of section 419A(f)(6) because it was "an aggregation of separate welfare benefit plans, each of which has an experience-rating arrangement with the contributing employer." In *Neonatology Associates P.A. v. Commissioner*, 115 T.C. 43 (2000), affd. 299 F.3d 221 (3d Cir. 2002), without deciding whether the plans in issue met the requirements of section 419A(f)(6), we held that the corporate employer/participants could not deduct contributions in excess of the cost of term life insurance. We also held that the disallowed deductions should be treated as dividend distributions to the employee-owners of the C corporations to the extent of earnings and profits. *Id.* at 96–97. In *V.R. DeAngelis M.D.P.C. v. Commissioner*, T.C. Memo. 2007–360, affd. per curiam 574 F.3d 789 (2d Cir. 2009), similarly without ruling on whether the plan met the requirements of section 419A(f)(6), we held that payments for life insurance were essentially a distribution of S corporation profits rather than payments made with compensatory intent. In *Curcio v. Commissioner*, T.C. Memo. 2010–115, again without ruling on whether the plan met the requirements of section 419A(f)(6), we held that contributions were distributions of profits to the employee-owners and not deductible pursuant to section 162(a).

We did not address in any of the foregoing cases the tax consequences to a nonowner employee for contributions to a plan that purportedly met the requirements of section 419A(f)(6) and subsequently was converted into a plan that no longer qualified. We must decide the consequences to petitioner of contributions to such a plan.

II. *Whether Respondent Was Required To Send a "30 day letter" to Petitioner and Whether the Notice of Deficiency Is Invalid Because Respondent's Position Is Not Adequately Set Forth*

In his petition and motion for summary judgment, petitioner contends that respondent failed to provide him with a "30-day letter" before issuing a notice of deficiency and failed to provide a specific theory of the case in the notice of deficiency. Generally, we will not look behind a notice of deficiency to examine the evidence used, the propriety of

the Commissioner's motives, or administrative policy or procedure used in making the determination. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974). Accordingly, we will not look into respondent's alleged failure to issue a 30-day letter. See *id.*

As to whether the notice of deficiency is invalid because it insufficiently sets forth respondent's position, section 7522(a) requires that the notice "describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." The purpose of section 7522 is to provide the taxpayer with notice of the Commissioner's basis for determining a deficiency. *Shea v. Commissioner*, 112 T.C. 183, 196 (1999). The notice needs to be sufficient to permit the taxpayer to comply with the requirement of Rule 34(b) that the taxpayer make clear and concise assignments of every error alleged against the Commissioner.[22] *Id.* at 196– 197. We have held that section 7522(a) does not require the Commissioner to identify the specific statutory provision sup- porting each adjustment in the notice of deficiency. *Wheeler v. Commissioner*, 127 T.C. 200, 205 (2006), affd. 521 F.3d 1289 (10th Cir. 2008); *Rogers v. Commissioner*, T.C. Memo. 2001–20, affd. without published opinion 281 F.3d 1278 (5th Cir. 2001). Additionally, the Commissioner is not required to lay out the factual basis for his determination in the notice of deficiency. *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 113 (2009), affd. 613 F.3d 1360 (11th Cir. 2010). More- over, even an inadequate description of the Commissioner's basis in the notice of deficiency will not invalidate the notice. Sec. 7522(a).

Petitioner received a Form 886–A, Explanation of Items, accompanying his notice of deficiency. The Form 886–A explains how the IRS determined petitioner's deficiency and states:

---

[22] Rule 34(b) requires that the petition contain:

(4) Clear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency or liability. The as- signments of error shall include issues in respect of which the burden of proof is on the Commis- sioner. Any issue not raised in the assignment of error shall be deemed to be conceded. Each assignment of error shall be separately lettered.

(5) Clear and concise lettered statements of the facts on which petitioner bases the assign- ments of error, except with respect to those assignments of error as to which the burden of proof is on the Commissioner.

7.a. *Other Income—Niche Conversion/Contribution*:

It has been determined that you received income in the amount of $102,339.00 in the taxable year ending December 31, 2004, under the provisions of I.R.C. §§ 61, 72, 83 and 402(b) as a result of your participation in the National Benefit Plan and Trust Plan and it's [sic] companion Trust and the Keady Ltd Welfare Benefit Plan Single Employer Plan and it's [sic] companion Trust. Accordingly, your taxable income is increased by $102,039.00 for the taxable year December 31, 2004.

The quoted explanation recites the Code sections on which the IRS relies even though specific citations are not required for the notice to be valid. See *Wheeler v. Commissioner*, *supra* at 205; *Rogers v. Commissioner*, *supra*. In the instant case, the explanation provides sufficient detail that petitioner should be able to understand that the Plan's conversion to an SEP is the source of the income respondent determined. Accordingly, we hold that the notice of deficiency, with the accompanying Form 886–A, provides an adequate basis for understanding the IRS' determination of tax due. Consequently, we hold that petitioner's contention is without merit and the notice of deficiency is valid.

III. *Inclusion in Petitioner's Income of the Cash Value of the Insurance Policy Upon Conversion From MEP to SEP*

We next address whether petitioner must include in his gross income the cash value of the insurance policy upon conversion of the Plan from an MEP to an SEP. Respondent contends that petitioner became substantially vested in the Plan upon its conversion from an MEP to an SEP pursuant to section 1.402(b)–1(b), Income Tax Regs. Petitioner contends that he has no interest in the Plan because the terms of the Plan and the involuntary nature of the conversion of the Plan from an MEP to an SEP preclude him from being "substantially" vested in the Plan or the Plan assets. See sec. 402(b)(1); sec. 1.402(b)–1(a)(1), Income Tax Regs. Additionally, petitioner contends that the life insurance policy premiums were paid with Mrs. Cadwell's after-tax funds and, therefore, result in a gift to petitioner pursuant to section 2523. In the alternative, petitioner contends that, if he has an interest in the Plan, respondent has overstated its value. We address each of these issues below.

A. *Whether Petitioner Is Substantially Vested in His Interest in the Plan*

Section 402(b)(1) provides that employer contributions made to a nonexempt employee trust[23] are included in the gross income of the employee to the extent that the employee's interest in such contribution is substantially vested (within the meaning of section 1.83–3(b), Income Tax Regs.) at the time the contribution is made. Sec. 1.402(b)–1(a)(1), Income Tax Regs. If the rights of an employee under a nonexempt employee trust become substantially vested during a taxable year of the employee and the taxable year of the trust ends with or within such year, the value of the employee's interest in the trust on the date of such change is included in the employee's gross income for that taxable year. Sec. 1.402(b)–1(b)(1), Income Tax Regs. The "value of an employee's interest in a trust" means the amount of the employee's beneficial interest in the net fair market value of all of the assets in the trust as of any date on which some or all of the employee's interest in the trust becomes substantially vested. Sec. 1.402(b)–1(b)(2)(i), Income Tax Regs. The net fair market value of all of the assets in the trust is the total amount of the fair market values (determined without regard to any lapse restriction, as defined in section 1.83–3(h), Income Tax Regs.) of all of the assets in the trust, less the amount of liabilities, as of the date on which some or all of the employee's interest in the trust becomes substantially vested. *Id.* If only a portion of an employee's interest in the trust becomes substantially vested during a taxable year, only the corresponding part of the trust value is includable in the employee's gross income. Sec. 1.402(b)–1(b)(4), Income Tax Regs.

An employee's interest in property is substantially vested when it is either transferable or not subject to a substantial risk of forfeiture. Sec. 1.83–3(b), Income Tax Regs. Whether a risk of forfeiture is substantial depends on the facts and circumstances. Sec. 1.83–3(c)(1), Income Tax Regs. A substantial risk of forfeiture exists:

[23] An employee trust is a nonexempt trust if it is not exempt from taxation under sec. 501(a). Sec. 402(b)(1).

where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied. * * * [*Id.*]

Property is not subject to a substantial risk of forfeiture if the employer must pay fair market value for its return or there is risk that the property's value may decline. *Id.* In instances where an employee of a corporation owns a significant amount of the total combined voting power or value of all classes of stock in the employer corporation, the issue of whether an employee's interest is subject to a substantial risk of forfeiture also depends upon:

(i) the employee's relationship to other stockholders and the extent of their control, potential control and possible loss of control of the corporation, (ii) the position of the employee in the corporation and the extent to which he is subordinate to other employees, (iii) the employee's relationship to the officers and directors of the corporation, (iv) the person or persons who must approve the employee's discharge, and (v) past actions of the employer in enforcing the provisions of the restrictions. * * * [Sec. 1.83–3(c)(3), Income Tax Regs.]

Both parties treat petitioner's interest in the Plan as subject to a substantial risk of forfeiture before the Plan's conversion to an SEP on November 17, 2004. As stated above, the issue of whether the Plan qualified pursuant to section 419(A)(f)(6) before conversion is not in issue. Therefore, for purposes of the instant motions, we will assume that before the Plan's conversion from an MEP to an SEP, the Plan's assets were subject to a substantial risk of forfeiture.

On November 17, 2004, Niche amended the Plan to convert the Plan from an MEP to an SEP. Keady's SEP received its proportional share of the Plan's assets. Following the conversion of the Plan, the assets in Keady's SEP could be used only to pay the claims of Keady employees. The conversion of the Plan from an MEP to an SEP eliminated the risk that Keady's assets could be used to pay other employers' claims. In other words, a future condition that could have occurred under the original Plan as an MEP, i.e., another company's claim to the cash value of Keady's life insurance policies, no longer existed under the Plan as an SEP. See sec. 1.83–1(c)(1), Income Tax Regs.

According to the terms of the SEP, Keady could terminate the SEP at any time. In the event of an employer withdrawal from the SEP, the Trust could distribute the life insurance policies to Keady, sell the life insurance policies to any interested purchaser with an insurable interest in the employees, or surrender the life insurance policies to the insurance company for their cash surrender value. Additionally, the Trust could sell petitioner his life insurance policy.

While section 1.83–1(c)(3), Income Tax Regs., is not directly applicable because petitioner does not own any of Keady's stock, it is instructive under the circumstances of the instant case. Petitioner's wife is the sole shareholder of Keady.[24] At the time of the hearing, petitioner and Mrs. Cadwell were still married. The record does not contain any evidence of strife in petitioner's working or personal relationship with Mrs. Cadwell. Petitioner listed his position as "Secretary" of Keady, and the record does not include any information regarding other officers. Mrs. Cadwell is the only director. Accordingly, we conclude that petitioner is the sole officer of Keady and that he was not subordinate to any other employee. See also 15 Pa. Cons. Stat. Ann. sec. 1732(a) (West 1995) (every corporation must have a president, a secretary, and a treasurer and these offices may be held by the same person). As the sole officer of Keady, he had control over his own eligibility under Keady's SEP. Additionally, as the sole officer, petitioner could terminate the Plan and have the assets distributed to Keady.

Petitioner cites *Booth v. Commissioner*, 108 T.C. at 564, for the proposition that his power to terminate the Plan does not require the inclusion of the cash value of the life insurance policy in his income. Petitioner contends that if he were required to realize income based on his power to terminate, the Plan contributions would be taxable upon funding. In *Booth*, the Court determined whether the plan in issue was a deferred compensation plan. We stated:

Although respondent is concerned that the ability of a participating employer to terminate voluntarily its participation in the * * * [plan] allows the employer to control the timing of income to its employees, we regard that concern as misplaced. Respondent's concern could also be expressed with respect to the pension plan of a corporation owned by a

---

[24] The parties do not contend that family attribution rules apply.

single shareholder. Although the shareholder may be the only employee, it does not necessarily follow that such a pension plan provides for receipt of deferred compensation merely because the owner/shareholder has the ability to terminate the pension plan at will. [*Id.*]

*Booth* is distinguishable from the instant case as deferred compensation is not in issue here. Moreover, because the Plan is a nonexempt trust, the taxation of an employee on contributions made on his behalf turns on whether the employee's interest is substantially vested. See sec. 1.402(b)–1(b)(1), Income Tax Regs. Whether an employee's interest is substantially vested depends upon all of the facts and circumstances, including the employer's ability to terminate the Plan. See sec. 1.83–3(c)(1), Income Tax Regs.

Petitioner also contends that the vesting schedule prevents him from having a vested interest in the SEP during 2004. Additionally, petitioner contends that, if any interest was vested, Mrs. Cadwell could fire him at will, and, therefore, his benefits under the SEP remained subject to a substantial risk of forfeiture. We disagree.

We conclude that the vesting restrictions are illusory under the circumstances of the instant case.[25] When the Trust's assets came under Keady's exclusive control, they became subject to petitioner's control. As noted above, petitioner could terminate the SEP and have the plan assets or their cash equivalent distributed to Keady. Moreover, if the vesting schedule were to apply, the power to enforce the restrictions against petitioner would be in the hands of petitioner, his wife, or his daughters. Under such circumstances, the restrictions on petitioner's power to obtain the Plan proceeds are illusory.

Petitioner relies upon *Olmo v. Commissioner*, T.C. Memo. 1979–286, a case in which we held that the taxpayers' interest in nonexempt trusts was substantially vested only to the extent of the vesting schedule. In *Olmo*, a professional corporation owned by two unrelated taxpayers, each a 50-

---

[25] We note that according to its terms, if the Plan no longer qualifies as an MEP pursuant to sec. 419A(f)(6), the Trustee was to terminate the Plan. Upon termination, the assets would be distributed to each covered employee in an amount equal to his or her benefit balance. Additionally, each covered employee would be 100 percent vested in his or her benefits upon termination. However, the Plan could be amended at any time with the vesting schedule potentially remaining in effect. The record is not sufficiently developed to determine whether the Plan was properly amended before it was converted to an SEP. Because we find the vesting restrictions illusory, we need not address this argument.

percent shareholder, established a pension trust and a profit-sharing trust. The taxpayers were each 40 percent vested. To increase their vesting rights, the taxpayers were required to complete future years of service, and, if they left the business, they forfeited their rights to the nonvested portion of the plan. Upon termination of the trusts, each participant would be 100 percent vested. Additionally, if a matter arose affecting an individual taxpayer's status as a participating member of a trust, the taxpayer was automatically disqualified from participating in a decision as to that matter. The Court concluded that the taxpayers' nonvested interests were subject to a substantial risk of forfeiture on account of the internal controls present. *Id.*

The facts of the instant case are distinguishable from those of *Olmo*. In the instant case, the terms of the SEP provide that the Plan Administrator is the employer. In effect, petitioner, as the only officer, is the Plan Administrator. The Plan Administrator decides all questions relating to the "eligibility of employees to participate" in the Plan. Unlike in *Olmo*, the SEP does not have a disqualification provision that would prevent petitioner from deciding questions regarding his own eligibility. Even if Keady did elect to appoint another person as Plan Administrator, that person would be chosen by either petitioner, as sole officer of Keady, or Mrs. Cadwell, as Keady's sole director. Therefore, any decision regarding petitioner's eligibility would be decided by someone with a potential interest in the life insurance policy; i.e., Mrs. Cadwell, petitioner's wife; or petitioner himself. We concluded above that any restrictions on petitioner's right to control the disposition of the Trust assets are illusory. Consequently, we find the instant case is distinguishable from *Olmo*.

Petitioner's contention that he could be fired and therefore lose his benefits is also without merit. As of the hearing, petitioner was still married to Mrs. Cadwell who was the 100-percent shareholder of Keady, his employer. Petitioner argues only that there is a possibility that he could be fired by Mrs. Cadwell. Under such circumstances, we conclude that the threat that petitioner could be fired by his wife is illusory and his interest is not subject to a substantial risk of forfeiture.

On the basis of the record, we conclude that petitioner's interest in the postconversion SEP was no longer subject to a substantial risk of forfeiture; i.e., was substantially vested upon conversion of the Plan to an SEP.

B. *Whether the Contributions to the Plan Were a Gift From Mrs. Cadwell to Petitioner*

Alternatively, petitioner contends that the contributions to the Plan, i.e., the payments for the life insurance policy, were a gift from Mrs. Cadwell to him pursuant to section 2523 and that all payments were made using her after-tax dollars. Petitioner contends that we should apply the substance over form doctrine, citing *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945), to recognize such payments as a non-taxable gift.

Section 2523 allows a donor a deduction in computing taxable gifts for purposes of computing the gift tax. As Mrs. Cadwell would be the hypothetical donor in the scenario posited by petitioner, we conclude that section 2523 does not apply. Petitioner may have meant to cite as support for his contention section 102(a), which excludes from gross income the value of property acquired by gift. However, for reasons discussed below, section 102(a) is inapplicable.

Pursuant to the substance over form doctrine, although the form of a transaction may literally comply with the provisions of the Code, that form will not be given effect where it has no business purpose and operates simply as a device to conceal the true character of a transaction. See *Gregory v. Helvering*, 293 U.S. 465, 469–470 (1935). If, however, the substance of a transaction accords with its form, that form will be upheld and given effect for tax purposes. See *Blueberry Land Co. v. Commissioner*, 361 F.2d 93, 100–101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964). Additionally, it is well settled that "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. Natl. Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148 (1974).

Petitioner's contention regarding substance over form is misplaced. The record reveals that the $75,000 payment made during 2002 was paid from an account held in the name of KSM. The $38,800 in payments made during 2004

was paid out of the KSM escrow account. In his declaration filed after the hearing on the instant motions, petitioner contends that the premium payments were made with "after-tax funds distributable to * * * [Mrs. Cadwell], as primary owner of KSM." In other words, petitioner claims that the funds belonged to KSM, but were "distributable" to Mrs. Cadwell. As the payments were not distributed to Mrs. Cadwell, therefore, they would have been made by funds still owned by KSM. Consistent with *Natl. Alfalfa*, we shall give effect to the transaction as it actually occurred as opposed to revising the transaction to create a gift.

On the basis of the record, we conclude that the substance and the form of the contributions were payments by KSM, not Mrs. Cadwell. Consequently, section 102(a) is inapplicable.

C. *Whether the Cash Value Is Income to Petitioner Where His Employer Did Not Claim Corresponding Deductions for Its Contributions to the Policy*

We next address petitioner's contention that the cash value of the life insurance policy is not income to him because neither Keady nor KSM claimed deductions for contributions made during 2002 and 2004. Petitioner contends that, because a deduction is available under section 83(h), the cash value of the life insurance policy was not income to him, since Keady would have claimed a corresponding deduction for the premium payments. Petitioner's contention is misplaced. Section 402(b)(1) does not condition the inclusion in income on an employer's deduction of the payment. Rather, inclusion in gross income is based upon whether the trust is not exempt and whether the taxpayer's interest is substantially vested. See sec. 402(b)(1); sec. 1.402(b)–1(a)(1), (b)(1), Income Tax Regs. Moreover, while section 83(h) allows a deduction, it is not required for a contribution to be included in gross income pursuant to section 83(a). Therefore, whether Keady or KSM claimed a deduction for the contributions is immaterial.

Accordingly, we hold that the cash value of the life insurance policy must be included in petitioner's gross income for his 2004 tax year pursuant to section 1.402(b)–1(b)(1), Income Tax Regs.

D. *The Amount To Be Included in Petitioner's Gross Income*

Respondent contends that the cash value of the life insurance policy is the fund value of $70,529. Petitioner contends that if he must include any amount in his gross income, only the cash surrender value of the life insurance policy after deducting surrender charges of $45,291 should be so included; i.e., $25,238.

Section 1.402(b)–1(b)(2)(i), Income Tax Regs., provides that the value of an employee's interest is "the amount of the employee's beneficial interest in the net fair market value of all the assets in the trust as of any date on which some or all of the employee's interest in the trust becomes substantially vested." The net fair market value is the total fair market value determined without regard to any "lapse restrictions" as defined in section 1.83–3(h), Income Tax Regs., less the amount of liabilities to which such assets are subject. Sec. 1.402(b)–1(b)(2)(i), Income Tax Regs.

Section 1.83–3(h), Income Tax Regs., defines a "nonlapse restriction" as a restriction that will never lapse. A nonlapse restriction is "a permanent limitation on the transferability of property" and requires the transferee to sell, or offer to sell, the property at a price determined under a formula, and the restriction will continue to apply against the transferee or any subsequent holder. *Id.* For example, a permanent right of first refusal in a particular person at a price determined under a formula would be a nonlapse restriction. *Id.*; see also sec. 1.83–5(c), *Example* (*1*), Income Tax Regs. A "lapse restriction" is any restriction other than a nonlapse restriction and includes, but is not limited to, a restriction that carries a substantial risk of forfeiture. Sec. 1.83–3(i), Income Tax Regs. The flush language of section 1.83–3(h), Income Tax Regs., cites limitations imposed by registration requirements of State or Federal security laws as examples of restrictions that are not nonlapse restrictions.

Rev. Proc. 2005–25, 2005–1 C.B. 962, provides a safe harbor for determining the fair market value of a life insurance policy for purposes of applying section 402(b), and petitioner has not suggested any reason for deviating from the formula it provides.[26] For a nonvariable or variable life

---

[26] Rev. Proc. 2005–25, 2005–1 C.B. 962, is applicable to nonexempt employees' trusts for pur-

insurance contract the safe-harbor fair market value is the greater of:

A) the sum of the interpolated terminal reserve and any unearned premiums plus a *pro rata* portion of a reasonable estimate of dividends expected to be paid for that policy year based on company experience, and B) the product of the PERC amount (the amount * * * based on premiums, earnings, and reasonable charges) and the applicable Average Surrender Factor * * * [*Id.* sec. 3.02, 2005–1 C.B. at 963–964.]

The PERC amount is the aggregate of:

(1) the premiums paid from the date of issue through the valuation date without reduction for dividends that offset those premiums, plus (2) dividends applied to purchase paid-up insurance prior to the valuation date, plus (3) any amounts credited (or otherwise made available) to the policyholder with respect to premiums, including interest and similar income items (whether credited or made available under the contract or to some other account), but not including dividends used to offset premiums and dividends used to purchase paid up insurance, minus (4) explicit or implicit reasonable mortality charges and reasonable charges (other than mortality charges), but only if those charges are actually charged on or before the valuation date and those charges are not expected to be refunded, rebated, or otherwise reversed at a later date, minus (5) any distributions (including distributions of dividends and dividends held on account), withdrawals, or partial surrenders taken prior to the valuation date. [*Id.*]

For variable contracts, the revenue procedure defines the fair market value in a substantially similar manner as for a nonvariable contract.[27] *Id.* sec. 3.03. As the valuation methods are substantially similar, we need not decide whether the life insurance policy is a variable or nonvariable life insurance contract.

According to Rev. Proc. 2005–25, *supra*, the surrender charge should be disregarded for valuation purposes. The surrender charges apply in decreasing amounts beginning in the life insurance policy's first year and are reduced to zero in the life insurance policy's 15th year. In other words, any holder of the life insurance policy beyond 15 years could redeem the life insurance policy for its stated cash value with

poses of sec. 402(b) for periods on or after Feb. 13, 2004. Rev. Proc. 2005–25, sec. 5, 2005–1 C.B. at 965.

[27] For variable contracts, the only difference occurs in step 3. For step 3, "all adjustments (whether credited or made available under the contract or to some other account) that reflect the investment return and the market value of segregated asset accounts" are added or subtracted to determine the PERC value. Rev. Proc. 2005–25, sec. 3.03, 2005–1 C.B. at 964.

no penalty. Accordingly, it will be disregarded for the purpose of valuing petitioner's interest in the life insurance policy. See Rev. Proc. 2005–25, sec. 3.04(1), 2005–1 C.B. at 964 ("The Average Surrender Factor for purposes of § * * * 402(b) (for which no adjustment for potential surrender charges is permitted) is 1.00.").

On December 31, 2002, KSM paid $75,000 to the Plan Trustee to cover Keady's initial contribution and $2,050 to cover the MEP fee. Of the $75,000 payment, $73,000 was credited to petitioner's life insurance policy. On May 20, 2004, KSM contributed $36,000 for the Plan's premiums and $2,800 to cover the Plan fee. Of the $36,000 contribution, $18,000 was credited to petitioner's life insurance policy. During 2003 and 2004, petitioner's life insurance policy was also increased by interest payments of $6,134, for a total of $97,134. Petitioner's life insurance policy was decreased during 2003 and 2004 for mortality charges of $16,235 and other expenses of $10,370, respectively, for a total of $26,605. As noted above, petitioner's interest in the life insurance policy is not reduced by any surrender charges. Accordingly, we conclude that the PERC value of petitioner's interest in the life insurance policy is $70,529.[28]

Neither party contends that the alternative valuation measure allowed pursuant to Rev. Proc. 2005–25, *supra*, would result in a higher valuation. Additionally, neither party contends that petitioner's life insurance policy is subject to any liabilities. See sec. 1.402(b)–1(b)(2)(i), Income Tax Regs. Accordingly, we hold that petitioner must include in gross income the cash value of the life insurance policy of $70,529.

IV. *Whether Petitioner Must Include in Gross Income the Excess Contributions*

During 2004, KSM contributed life insurance policy premiums of $36,000. Petitioner's life insurance policy was credited with a payment of $18,000. Respondent concedes that $645 of the remaining $18,000 was used to pay the annual premium on Miranda's and Jennifer's policies. Respondent contends that the excess contribution, $17,355, should be

_____

[28] Petitioner does not contend that the premiums, interest credits, mortality charges, or other expenses should be prorated. Accordingly, we deem this argument conceded.

included in petitioner's gross income pursuant to section 1.402(b)–1(b)(1), Income Tax Regs.

As discussed above, the parties treat petitioner's interest in the Plan before conversion as being subject to a substantial risk of forfeiture, i.e., not substantially vested. We concluded above that, following the conversion of the Plan to an SEP, petitioner's interest was substantially vested. See *id.* Additionally, neither party contends that the excess contribution is subject to any liabilities. Sec. 1.402(b)–1(b)(2)(i), Income Tax Regs. (the net fair market value of a taxpayer's interest in the trust is the fair market value of all the assets less any liabilities to which such assets are subject).

Petitioner makes the same contentions with respect to the inclusion of the excess contributions in gross income as he did with respect to the cash value of the life insurance policy; i.e., the Plan contributions were a gift from Mrs. Cadwell, and he has no interest in the Plan. We apply the same analysis as we did above and conclude that petitioner's contentions are without merit.

Petitioner also contends that the excess contributions have been accounted for in the cash value of the life insurance policy. Of the $36,000 contribution for life insurance protection made during 2004, $645 was credited towards Miranda's and Jennifer's life insurance policies. In the PERC calculation set forth above, $18,000 of the $36,000 was credited towards the cash value of petitioner's life insurance policy. The $17,355 excess contribution was not credited toward the cash value of the life insurance policy covering petitioner discussed in the PERC valuation above. Consequently, the inclusion of the excess contribution in petitioner's income would not be "double-counting".

Accordingly, we hold that the excess contribution of $17,355 must be included in petitioner's gross income for his 2004 tax year. [29]

---

[29] Petitioner contends that respondent has overstated the value of the excess contributions. Where a motion for summary judgment has been properly made and supported, the opposing party may not rest upon mere allegations or denials in that party's pleadings but must by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial. Rule 121(d). Respondent's motion was properly made and supported. Petitioner has not offered specific facts to show that there is a genuine issue for trial regarding the value of the excess contributions. Accordingly, we conclude that summary judgment is appropriate on this issue.

V. *Whether Petitioner Must Include the Cost of the Life*
    *Insurance Protection in His Gross Income*

Respondent contends that the cost of life insurance protection Keady provided to petitioner during 2004 was an economic benefit and, therefore, should be included in his gross income under section 402(b) or section 61. Petitioner contends that neither section is applicable. We agree with respondent that the value of the cost of life insurance protection is included in petitioner's gross income under section 61.

Gross income includes income from whatever source derived, including income for services. Sec. 61(a). The term "gross income" is construed broadly, as opposed to exclusions from gross income, which are construed narrowly. *Commissioner v. Schleier*, 515 U.S. 323, 328 (1995). Generally, life insurance premiums paid by an employer on the life of his employee, where the proceeds of such insurance are payable to the beneficiary of the employee, are included in the gross income of the employee. Sec. 1.61–2(d)(2)(ii)(A), Income Tax Regs.

We note that section 1.61–2(d)(6), Income Tax Regs., does not apply because, pursuant to section 1.83–3(e), Income Tax Regs., current life insurance protection is not "property". As noted above, section 402(b)(1) is inapplicable. Moreover, the cost of life insurance protection generally is taxable under section 61 and the regulations pursuant to section 61. Sec. 1.83–1(a)(2), Income Tax Regs.

Petitioner received life insurance protection pursuant to the payments made by KSM to purchase the life insurance policy on petitioner's life. That life insurance protection was a valuable benefit and significant accession to petitioner's wealth; i.e., $1 million payable to his daughters if he were to die during 2004. See *United States v. Burke*, 504 U.S. 229, 233 (1992) ("Congress intended through § 61(a) * * * to bring within the definition of income any 'accession to wealth'" (quoting *Commissioner v. Glenshaw Glass, Co.*, 348 U.S. 426, 431 (1955))). In *V.R. DeAngelis M.D.P.C. v. Commissioner*, T.C. Memo. 2007–360, a group of doctors combined to form a trust, purportedly qualified pursuant to section 419A(f)(6), whose purpose was to fund the purchase of life insurance policies. In discussing the tax consequences of the premium payments in *V.R. DeAngelis M.D.P.C.*, we

stated that the "payments of the premiums were indeed accessions to the doctors' wealth".[30] Similarly, the premium payments are accessions to petitioner's wealth and should be included in his gross income pursuant to section 61.

Petitioner offers the same theories regarding the current year cost of life insurance protection as he did for the inclusion of the cash value of the life insurance policy and the excess contributions. Those theories are similarly unpersuasive regarding the inclusion of the current year cost of life insurance in his gross income. Accordingly, we hold that petitioner must include in his gross income for his 2004 tax year the current year cost of life insurance protection.

Petitioner contends that the fair market value of the cost of life insurance is $8,496; i.e., the 2004 mortality charges. Respondent contends that the value of the life insurance protection is $13,510; i.e., the annual cost, according to Notice 2001–10, Table 2001, 2001–1 C.B. 459, 463, for $1 million worth of life insurance for an individual who is 66 years old. The regulations provide little guidance in determining the cost of life insurance protection that is included in gross income pursuant to section 61. Accordingly, it is helpful to examine how other parts of the Code, including provisions governing the taxation of split-dollar life insurance and group term life insurance, calculate the cost of 1 year of life insurance protection.

Generally, split-dollar life insurance is any arrangement between an owner and a nonowner of a life insurance contract where one party pays the premiums and is entitled to recover all or a portion of such premiums from the proceeds of the life insurance contract and the arrangement is not group term life insurance. Sec. 1.61–22(b)(1), Income Tax Regs. Rev. Rul. 64–328, 1964–2 C.B. 11, provides that an employee must include in gross income the annual value of the benefit the employee receives under a split-dollar arrangement, which is an amount equal to the 1-year term cost of life insurance protection to which the employee is

---

[30] In *V.R. DeAngelis M.D.P.C. v. Commissioner*, T.C. Memo. 2007–360, we held that the premium payments were "essentially a distribution to the doctors of corporate profits rather than a payment that the PCs made to the doctors with a compensatory intent", because the doctor-employees were also the owners of the S corporations that provided them with benefits. See also *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43 (2000) (premium payments are a dividend to the extent of earnings and profits to employee-owners of a C corporation), affd. 299 F.3d 221 (3d Cir. 2002).

entitled from year to year, less the portion, if any, the employee provides. See also *Johnson v. Commissioner*, 74 T.C. 1316, 1322 (1980). We note that Rev. Rul. 64–328, *supra*, is not an attempt to include in gross income the entire life insurance premium, but rather only the cost of the current year's life insurance protection. The 1-year cost of life insurance protection is the amount to be determined in the instant case.

Rev. Rul. 64–328, *supra*, provides that the cost of life insurance protection should be calculated using the P.S. 58 rates found in Rev. Rul. 55–747, 1955–2 C.B. 228. Notice 2001–10, *supra*, revoked Rev. Rul. 55–747, *supra*, and provided Table 2001 as a substitute for the P.S. 58 rates.

In *Curcio v. Commissioner*, T.C. Memo. 2010–115, we used the rates in section 1.79–3(d), Income Tax Regs., as a "rough estimate" of the cost of life insurance protection to decide whether the taxpayer's expenses for life insurance were deductible pursuant to section 162(a). Table 2001 is an updated version of the rates found in section 1.79–3(d), Income Tax Regs. See Notice 2001–10, 2001–1 C.B. at 462 ("Table 2001 is based on the mortality experience reflected in the table of uniform premiums promulgated under section 79(c) of the Code (*see* § 1.79–3(d)(2) of the regulations), with extensions for ages below 25 and above 70, and the elimination of the five-year age brackets"); see also Notice 2002–8, 2002–1 C.B. 398. Accordingly, we conclude that, for purposes of the instant case, Table 2001 is a reasonable estimate of the cost of 1 year of life insurance protection.

Pursuant to Table 2001, the cost of $1 million worth of life insurance coverage for a 66-year-old is $13,510. As neither party has argued that the life insurance policy in issue is split-dollar life insurance, we need not address any issue regarding the effect of split-dollar life insurance on the calculation of the cost of the life insurance policy in issue. [31] Additionally, neither party contends that petitioner paid for such life insurance coverage.

We note that, if we were to include the entire $13,510 amount in petitioner's income, there would be double counting. Petitioner's gross income already includes the cash

---

[31] The life insurance policy in issue may qualify as split-dollar life insurance pursuant to sec. 1.61–22(b)(2), Income Tax Regs. However, the outcome would be the same if we classified the life insurance policy in issue as split-dollar life insurance.

value of the life insurance policy calculated under the PERC method. That method takes into account the premiums paid and any other income the life insurance policy earns, but it subtracts mortality charges and other expenses. To include the entire $13,510 in addition to the PERC value would partially double count a portion of the premium payment that has already been included in the PERC amount. [32]

Instead, the value for current year life insurance protection should be calculated by adding the mortality charge ($8,496) and other expenses ($2,640). The sum of $11,136 reflects the charges for current year life insurance that were already subtracted from the fair market value calculation determined using the PERC amount, pursuant to Rev. Proc. 2005–25, *supra*. Therefore, we conclude that when the PERC formula has been used to calculate the fair market value of the policy, the cost of insurance may be calculated by adding the mortality charges and other expenses.

Petitioner contends that we should consider only the current mortality charges rather than the Table 2001 rates. Petitioner in essence contends that the current mortality charges are the "insurer's published premium rates for one-year term insurance" pursuant to Rev. Rul. 66–110, 1966–1 C.B. 12. Pursuant to Notice 2002–8, 2002–1 C.B. at 398–399, the insurer's published premium rates may be used only if the taxpayer can show that the insurer generally makes the availability of such rates known to persons who apply for term insurance coverage from the insurer and the insurer regularly sells term insurance at such rates to individuals who apply for term insurance coverage through the insurer's normal distribution channels. Petitioner does not argue that the requirements of Notice 2002–8, *supra*, are unreasonable or incorrect. Furthermore, on a motion for summary judgment that is properly made and supported, the opposing

---

[32] Under the PERC method for 2004, petitioner's policy was credited with an $18,000 premium payment and was credited with $2,793 in interest, yielding a total of $20,793. However, petitioner's life insurance policy incurred a mortality charge of $8,496 and other expenses of $2,640, for a net value for his 2004 tax year of $9,657. Including the entire $13,510 from Notice 2001–10, Table 2001, 2001–1 C.B. 459, 463, would include in petitioner's gross income an amount equal to $23,167 ($9,657 + $13,510). In other words, including the entire $13,510 would double count the cost of life insurance protection by an amount equal to $2,373. ($23,167 (or $13,510 + $9,657) − $20,793 (or $18,000 + $2,793) = $2,373.) Consequently, we deem the $2,373 an amount already contributed by petitioner for purposes of such calculation and, accordingly subtract that amount from the $13,510 in costs. Therefore, petitioner must include in his gross income the value of the current year life insurance protection as a taxable benefit to him of $11,136.

party must set forth specific facts showing that there is a genuine issue for trial. Rule 121(d). Petitioner does not allege that he has any evidence that would satisfy that requirements of Notice 2002–8, *supra*. Furthermore, petitioner does not suggest that there is a material factual issue that could be resolved at trial. Accordingly, we conclude that summary judgment is appropriate on this issue and that the requirements of Notice 2002–8, *supra*, have not been met. Therefore, we hold that petitioner must include in his gross income for his 2004 tax year the cost of current year life insurance protection of $11,136.

## VI. *Whether Petitioner Is Liable for the Section 6662 Penalty*

Respondent contends that petitioner is liable for the accuracy-related penalty pursuant to section 6662(a) on account of a substantial understatement of tax, or in the alternative, on account of negligence or disregard of rules and regulations. See sec. 6662(b)(1) and (2).

A substantial understatement of income tax is an understatement that is greater than 10 percent of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A). An understatement is the excess of the amount required to be shown on the return for the taxable year over the amount actually shown on the return. Sec. 6662(d)(2).

The record reveals that petitioner's understatement will be greater than $5,000. Petitioner has failed to establish any defense to the accuracy-related penalty.

Consequently, we hold that petitioner is liable for the accuracy-related penalty under section 6662(b)(2).

We shall therefore grant respondent's cross-motion for summary judgment and deny petitioner's motion for summary judgment.

We have considered all of the issues raised by the parties, and, to the extent they are not discussed herein, we conclude that they are without merit, unnecessary to reach, or moot.

To reflect the foregoing,

> *An order and decision will be entered under Rule 155.*